The **COMMITTEE FOR REASONABLE REGULATION OF LAKE TAHOE, a Nevada nonprofit corporation, Plaintiff,**

v.

**TAHOE REGIONAL PLANNING AGENCY, Defendant.**

**No. CVN020558ECRRAM.**

United States District Court, D. Nevada.

April 14, 2005.

Mark H. Gunderson, Law Office of Mark H. Gunderson, Reno, Mark A. Teh and Ronald A. Zumbrun, Zumbrun Law Firm, Sacramento, CA, for Plaintiff.

Jordan C. Kahn and John L. Marshall, Tahoe Regional Planning Agency, Stateline, Fran M. Layton and William J. White, Pro Hac Vice Firm, Shute Mihaly & Weinberger, San Francisco, CA, for Defendant.

Christine A. Sproul, Pro Hac Vice Firm, Deputy Attorney General, State of California, Sacramento, CA, State of Nevada: William J. Frey, Nevada Attorney General's Office, Carson City, Pacific Legal Foundation: Gregory T. Broderick and R.S. Radford, Pro Hac Vice Firm, Pacific Legal Foundation, Sacramento, CA, Tahoe Lakefront Owner's Association: Daniel Maguire, Pro Hac Vice Firm, Davis, CA, Jeremy J. Nork, Hale Lane Peek, et al., Reno, NV, for Amicus Curiae.

### ORDER

EDWARD C. REED, JR., District Judge.

## I. INTRODUCTION: FACTUAL AND PROCEDURAL BACKGROUND

This action arises from a challenge to Defendant Tahoe Regional Planning Agency's ("Defendant" or "TRPA") draft proposal and subsequent adoption of a new scenic review system (the "Scenic Review Ordinance" or "SRO"). The SRO represents TRPA's response to the increase in size and visibility of residential housing in the Lake Tahoe Basin (the "Basin") and the attendant decline in scenic quality as reported in TRPA's 2001 threshold evaluation report. To accomplish its goal of limiting these reported negative scenic impacts, the Scenic Review Ordinance regulates the size, color, appearance, visibility, and other aspects of residential housing on littoral and shoreland properties[1] in the Basin and is designed to encourage structures to integrate and blend with the natural environment rather than contrasting with it.

The SRO is a multi-faceted, objective system that is designed to provide multiple options for permitting. It includes: (1) new design standards (relating to color and setbacks); (2) different levels of review depending on the scope of the project (ranging from exempt in-kind replacement to a comprehensive review for new residential construction); and (3) different options for compliance (standard option, visual magnitude option, or independent review). Of central importance to the SRO, the Contrast/Visual Magnitude Rating system uses a comprehensive objective scoring procedure, which numerically scores a house's scenic impact, as viewed from the Lake towards its shore, based upon certain pre-determined traits. Basic traits of the proposed structure result in an objective color-contrast score. Examples of these basic traits are a structure's color, the percentage of a structure's perimeter which is visible, and the articulation and surface texture of a structure's facade. A high color contrast score translates into more visible square footage allowed. Conversely, a low color contrast score results in less visible square footage allowed.

On October 22, 2002, Plaintiff The Committee for Reasonable Regulation of Lake Tahoe (the "Committee" or "Plaintiff") filed a complaint (# 2) and asserted several claims. On January 16, 2003, the Committee supplemented (# 9) its original complaint with additional claims and factual assertions. TRPA then filed a motion to dismiss (# 15) on March 31, 2003. We held a hearing on February 19, 2004, and then entered an oral order (# 77) on Feb-

---

1. TRPA's Code of Ordinances defines "[s]horeland" as "[t]he distance from the highwater line of Lake Tahoe to the most landward boundary of the littoral parcel, or 300 feet landward, whichever is lesser." (TRPA's Code of Ordinances (the "Code") § 2.2, Def.'s Request for Judicial Notice, Ex. 2 at 2–25.) TRPA's Code defines a "[l]ittoral parcel" as "[a] parcel of land adjoining or abutting the highwater elevation of a lake." (TRPA's Code § 2.2.) In our written order (# 78), we took judicial notice of the definitions listed here.

ruary 20, 2004, dismissing several of the Committee's claims with prejudice. Our March 29, 2004, written order (# 78) dismissed most the Committee's remaining claims with prejudice, except (1) its claim that TRPA was required to prepare an Environmental Impact Statement ("EIS") under its Code of Ordinances and its Compact, and (2) its takings claim. Our written order (# 78) dismissed those two claims without prejudice and granted the Committee sixty (60) days to file an amended complaint to replead those two claims.

On August 13, 2004, the Committee filed an Amended Complaint and Petition for Review (# 96) (the "Amended Complaint"). TRPA filed a Motion to Dismiss (# 100) the Amended Complaint on September 10, 2004. The Committee opposed (# 102) the Motion and TRPA replied (# 106). TRPA's Motion to Dismiss (# 100) is now ripe, and we now rule on said Motion.

## II. GENERAL BACKGROUND: TRPA's PURPOSE, STRUCTURE & THE SCENIC REVIEW ORDINANCE

The history of regulation at Lake Tahoe, TRPA's role in such regulation, and relevant information about TRPA is detailed in depth at *Comm. for Reasonable Regulation of Lake Tahoe v. TRPA*, 311 F.Supp.2d 972, 976–982 (D.Nev.2004). Since the opinion in *The Committee* was rendered in reference to the current dispute, we incorporate this background information and, for simplicity, we need not repeat it here. However, we will include background information that is directly relevant to the claims in the Committee's Amended Complaint.

### A. TRPA's Compact.

In 1968, the legislatures of California and Nevada responded to the regional problems presented by the unique characteristics of Lake Tahoe and adopted the Tahoe Regional Planning Compact (the "Compact"), which set goals for the protection and preservation of the Basin and also created TRPA to "coordinate and regulate development in the Basin and to conserve its natural resources." *Tahoe–Sierra Pres. Council v. TRPA*, 535 U.S. 302, 309, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (internal citation and quotations omitted). California and Nevada, with the approval of Congress and the President, eventually adopted an extensive amendment to the Compact that became effective on December 19, 1980. *Id.* Currently, the amended bi-state Compact provides a unique regulatory framework that governs many aspects of the Basin.[2] *See* Pub. Law No. 96–551, 94 Stat. 3233 (1980); Nevada Revised Statutes ("NRS") 277.200 *et seq.;* Cal. Gov't Code § 66801 *et seq.*

The Compact, which created Defendant TRPA, continues to dictate TRPA's goals, structure, responsibilities, powers, as well as other rules and requirements. *See* Compact, Art. I(b) & (c). Among other things, the Compact's findings and declarations of policy detail the public and private interests in protecting and enhancing the values of the Basin as well as the National and State interests in preserving environmental and recreational values. *See id.* at Art. I(a)(1)-(10). The Compact

---

**2.** Pursuant to our order (# 73), we take judicial notice of the Compact, which was attached to Defendant's first motion to dismiss (# 15). For reference, the Compact is published at 96 Pub. Law No. 96–551, 94 Stat. 3233 (1980), NRS 277.200 *et seq.*, and Cal. Gov't Code § 66801 *et seq.*, and can also be viewed and accessed at http://www.trpa. org/documents/about _trpa/ Bistate_ Compact.pdf. Because the Compact can be viewed at these sources, we will cite only to the relevant portions of the Compact throughout the remainder of this order.

uses the concept of an "environmental threshold carrying capacity" to accomplish its goal of protecting and enhancing the values of the Basin, including scenic values. *See id.* at Art. I(b) (granting TRPA with the "power to establish environmental threshold carrying capacities"); *id.* at Art. II(i) (defining an "[e]nvironmental threshold carrying capacity" as "an environmental standard necessary to maintain a significant *scenic,* recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region") (emphasis added). Although Article I(b) of the Compact grants TRPA the *power* to establish these carrying capacities, Article V(b) of the Compact actually mandates that TRPA "shall develop . . . environmental threshold carrying capacities for the region" within 18 months after the effective date of the amendments to the Compact.

## B. Scenic Thresholds.

Pursuant to the Compact's command to address scenic concerns through environmental threshold carrying capacities, TRPA has adopted different environmental threshold carrying capacities addressing scenic concerns ("scenic thresholds"). *See* Compact, Art. V(b), Art. II(i); (*see also* Def.'s Request for Judicial Notice ("RJN")[3], Ex. 1 at Ex. A–10 to Resolution 82–11 (adopting a scenic threshold).) SR–1, a scenic threshold adopted in 1982, sets a standard for the quality of scenic resources from viewpoints along major roadways in the Basin and from the Lake towards shore. (Def.'s RJN, Ex. 1 at Ex. A–10 to Resolution 82–11 (adopting SR–1).) SR–1 is of particular concern to this lawsuit because the Scenic Review Ordinance, which is primarily aimed at regulating views from the Lake towards the shore, is designed to attain SR–1. (Def.'s RJN, Ex. 7 at App. B to 2001 Threshold Evaluation Report.)

## C. The Regional Plan & Implementing Ordinances.

The Compact also authorizes TRPA "to adopt and enforce a regional plan and implementing ordinances which will achieve" any adopted environmental threshold carrying capacities. *See* Compact, Art. I(b). Under the Compact's mandate, the regional plan ("Regional Plan") "shall be a single enforceable plan" and includes many correlated elements relating to the regulation of the Basin, including "[a] conservation plan for the preservation, development, utilization, and management of the *scenic* and other natural resources within the basin, including but not limited to soils, shoreline and submerged lands, scenic corridors along transportation routes, open spaces, recreational and historical facilities." *Id.* at Art. V(c)(3) (emphasis added).

TRPA adopted its current Regional Plan for the Basin in 1987. In accordance with the Compact, TRPA has also adopted implementing ordinances ("TRPA's Code of Ordinances" or "TRPA's Code"), including the Scenic Review Ordinance, to try to achieve the scenic thresholds that have been established as environmental threshold carrying capacities and are identified in the Regional Plan.[4] (Def.'s RJN, Ex. 2.)

---

3. Pursuant to our order (# 73), we judicially noticed several of the exhibits that were attached to Defendant's RJN (# 16, # 53, # 56). When citing to these exhibits, we will note the appropriate exhibit number and any other relevant information that will assist in identifying the citation.

4. TRPA's Code of Ordinances can be accessed at either http://www.trpa. org/default.aspx? tabindex=2 & tabid=172 or Exhibit 2 of Defendant's RJN. For simplicity, we will henceforth only cite to the relevant Section of TRPA's Code of Ordinances rather than Exhibit 2 of Defendant's RJN.

## D. Threshold Evaluation Reports.

Section 32.8 of the Code of Ordinances directs that "TRPA shall prepare periodic reports on the attainment and maintenance of thresholds and standards" every five years. (TRPA's Code § 32.8.) According to the Code, the periodic progress reports ("threshold reports") "shall include, at a minimum[,][a] report on the amount and rate of actual progress toward threshold and standard attainment contributed by each compliance measure." (TRPA's Code § 32.8.A(1).) Under TRPA's Code, the threshold reports also must include a report on the cumulative impacts on each threshold of projects approved by TRPA, a report on the extent to which the Basin is making progress towards achieving each threshold, and recommendations for implementation of supplemental compliance measures to ensure progress towards attainment. (TRPA's Code § 32.8.A(2)-(5).)

The 2001 threshold report noted a negative trend in the attainment of SR–1. (See Def.'s RJN, Ex. 7 at 8–13 to 14 and Index No. SR–1.) The 2001 threshold report recommended adoption of mitigation measures that are similar to the requirements of the Scenic Review Ordinance. (See Def.'s RJN, Ex. 7.)

## E. The Scenic Review Ordinance.

The Scenic Review Ordinance (the "SRO") requires certain residential projects in shoreland or littoral parcels to meet objective aesthetic requirements to obtain a building permit. As detailed briefly at the beginning of this order, the SRO includes different levels of review depending on the extent of the project (no review for repair and maintenance; extensive review for new houses), and different options for compliance (basic mitigation standards, visual magnitude system, or an independent review). The SRO utilizes three major components to achieve its goal of minimizing the scenic impact of residential housing design: (1) design standards, (2) contrast rating/visual magnitude rating System, and (3) different levels of review.[5] (Def.'s RJN, Ex. 15 at 116.)

### 1. Design standards.

Design standards are architectural techniques that can reduce the overall contrast of the built environment. (Def.'s RJN, Ex. 15 at 116.) TRPA had previously adopted design standards and the proposed amendments relate to color, setbacks, and glass. (Id.)

### 2. Contrast Rating/Visual Magnitude.

The contrast rating/visual magnitude rating procedure involves a complex rating of a proposed structure based on various factors, such as screening, color, the exterior surface's pattern/texture, and the number of planes/degree of articulation, to determine the structures' contrast with the natural environment. (Def.'s RJN, Ex. 17, App. H–1.) The rating procedure computes an overall score that corresponds to the amount of visible square footage allowed. (Id. at H–3.) Projects that blend in with the natural environment are intended to result in high scores, and projects that contrast with the environment should result in low scores. (Id. at H–2.) A high rating score translates into a greater allowance for square footage; conversely, a low score translates into a very small allowance for visible square footage. (Id. at H–3.)

---

5. Although we briefly discussed the SRO in the opening to this order, we will detail the SRO in greater depth, perhaps repeating some information, because the intricate workings of the SRO are directly relevant to our analysis of associational standing.

### 3. Levels of Review.

The SRO also provides for several different levels of review. TRPA believes that this will allow for the streamlining of basic projects with little scenic impact and allow for more in-depth and objective treatment of projects that will have a greater impact. To streamline smaller projects, the ordinance exempts normal repair and maintenance (excluding painting or anything that affects color), as well as in-kind replacement. (TRPA's Code §§ 4.2.A, 30.15.C(1).)

If a homeowner seeks a permit for a more extensive project, she has three basic options for obtaining it under the SRO. Under the "Standard Option," as TRPA calls it, a permit applicant must show that her project meets a minimum visual contrast rating score through scenic best management practices ("BMPs") and other standards (setback, visible facade, height limits, etc.) depending on the scope and extent of the project. (TRPA's Code §§ 30.15.C(3), (4)(a), (5)(a).) Under the "Visual Magnitude Option," applicants can design their structures to include visual breaks and to meet a given color contrast score for a desirable square footage of visible facade. (Id. at §§ 30.15.C(4)(b), (5)(b).) Finally, the applicant or TRPA staff may elect to initiate an independent review. (Id. at § 30.15.E.) The independent review may employ an independent expert using TRPA's methodology (Id. at § 30.15.E(1)) or a scenic review panel composed of one member of TRPA's choice, one member of applicant's choice, and one member chosen by the two panel members that may use other professionally accepted methods of evaluating scenic impacts (Id. at § 30.15.E(2)).

### III. MOTION TO DISMISS STANDARDS

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) will only be granted if "it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir.1996). On a motion to dismiss, "we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (alteration in original). Moreover, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the non-moving party." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir.1996) (citation omitted).

Although courts generally assume the facts alleged are true, courts do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981). Accordingly, "[c]onclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss." *In re Stac Elecs.*, 89 F.3d at 1403 (citation omitted).

Review on a motion pursuant to Fed. R.Civ.P. 12(b)(6) is normally limited to the complaint itself. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001). If the district court relies on materials outside the pleadings in making its ruling, it must treat the motion to dismiss as one for summary judgment and give the non-moving party an opportunity to respond. Fed.R.Civ.P. 12(b); *see United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir.2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion

to dismiss into a motion for summary judgment." *Ritchie*, 342 F.3d at 908.

If documents are physically attached to the complaint, then a court may consider them if their "authenticity is not contested" and "the plaintiff's complaint necessarily relies on them." *Lee*, 250 F.3d at 688 (citation, internal quotations and ellipsis omitted). A court may also treat certain documents as incorporated by reference into the plaintiff's complaint if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908. Finally, if adjudicative facts or matters of public record meet the requirements of Fed.R.Evid. 201, a court may judicially notice them in deciding a motion to dismiss. *Id.* at 909; *see* Fed.R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

## IV. ANALYSIS

As we stated above, the Committee has brought two claims in its Amended Complaint. One, the Committee alleges that TRPA failed to conduct the necessary environmental review because it did not prepare an Environmental Impact Statement ("EIS"). Two, the Committee brings an as-applied takings claim asserting that the Scenic Review Ordinance represents a taking of its members' property rights without just compensation. We will address each claim in turn.

## A. Claim One: TRPA Did Not Conduct an Adequate Environmental Review.

The Committee alleges that TRPA's use of an Initial Environmental Checklist ("IEC") to determine whether to prepare an Environmental Impact Statement ("EIS") is inconsistent with the National Environmental Policy Act ("NEPA"). Although the Committee does not specify the legal grounds for its challenge under the Compact, we take this as an allegation that TRPA's use of an IEC and not the more-demanding Environmental Assessment ("EA"), as allegedly required by NEPA, means that TRPA has "failed to proceed in a manner required by law." Compact, Art. VI(j)(5). The Committee further alleges that the Compact requires TRPA to prepare an EIS because the Scenic Review Ordinance will have a "significant effect on the environment." (*See* Pl.'s Am. Compl., ¶ 38.) We take this as an assertion that TRPA's determination that the Scenic Review Ordinance "could not have a significant effect on the environment" (TRPA's Code of Ordinances § 5.2B(1)) and no EIS need be prepared (*see* TRPA's Code § 5.6) was "lacking in substantial evidentiary support" or was "not supported by substantial evidence in light of the whole record[,]" *see* Compact, Art. VI(j)(5).

1. **Under the Compact, it is lawful for TRPA to rely on an IEC to make a finding that a matter "could not have a significant effect on the environment."**

*a) TRPA's IEC and EA procedures.*

The Compact requires TRPA to prepare and to consider a detailed environmental impact statement when acting upon matters that have a "significant effect on the environment." *See* Compact, Art. VII(a)(2). However, the Compact also mandates that TRPA "adopt ordinances prescribing specific written findings that the agency must make prior to approving any project in the region." *See* Compact, Art. V(g). Pursuant to this power, TRPA has adopted ordinances to determine what written findings and procedures are required for environmental documentation, including whether a matter will have a

"significant, effect on the environment." (*See* TRPA's Code §§ 5.0—5.8.D.) TRPA's Code of Ordinances mandates that TRPA use either an IEC or an EA to "determine whether an environmental impact statement shall be prepared." (*See id.* at § 5.2.)

Under the first step of the environmental documentation process, the applicant (in this case, TRPA) must prepare an IEC. (*See id.* at § 5.2.A.) The IEC asks the applicant a series of questions related to potential environmental issues that are designed to elicit "yes" responses to matters that may have a significant effect on the environment.[6] (*See id.; see also* IEC prepared for Scenic Review Ordinance, Def.'s RJN, Ex. 13.) The Code requires that the IEC "describe and evaluate the significance of all impacts receiving 'yes' answers." (TRPA's Code § 5.2.A(1).) Apparently, the IEC need not elaborate further on "no" answers. (*See* IEC prepared for Scenic Review Ordinance, Def.'s RJN, Ex. 13.)

After preparation of the IEC, TRPA must decide if it has sufficient evidence to make a finding under TRPA's Code Section 5.2.B whether the project either (1) "could not have" or (2) "may have" a "significant effect on the environment."[7] (*See* TRPA's Code §§ 5.2.B, 5.3.) Based on the information submitted in the IEC and other information known to TRPA, TRPA can make a finding under Code Section 5.2.B(1) that the proposed project "could not have a significant effect on the envi-

ronment and a finding of no significant effect shall be prepared." (*Id.* at § 5.2.B(1).) If a finding of no significant effect is made, "no further environmental documentation shall be required." (*Id.* at § 5.6.) On the basis of information provided in an IEC, TRPA can also make a finding that a proposed project "may have a significant effect on the environment" and order the preparation of an EIS. (*Id.* at § 5.2.B(3).)

Alternatively, if TRPA determines that an IEC will not provide sufficient information to make the findings required by Code Section 5.2.B (whether a project "may" or "could not" have a significant effect on the environment), then TRPA shall prepare an EA. (*Id.* at § 5.3.) Ultimately, the Code requires TRPA to make the same findings based on an EA as were required with an IEC. (*See id.* at §§ 5.3.B, 5.2.B(1)-(3).) If the EA shows that the "proposed project *may* have a significant effect on the environment[,]" then "an environmental impact statement shall be prepared." (*Id.* at § 5.2.B(3) (emphasis added).) If the EA shows that the "proposed project could not have a significant effect on the environment" (*Id.* at § 5.2.B(1)), then "no further environmental documentation shall be required" (*Id.* at § 5.6). Finally, TRPA is required to make these findings under either the IEC or the EA process on the basis of "substantial evidence," Compact, Art. VI(b), and its decision is subject to review in the appropriate court, *see* Compact, Art. VI(j)(1)-(2), if the decision is

---

**6.** The IEC asks questions that are framed in a manner that "yes" answers will flag projects that might affect the environment. Examples of these types of questions are: "[w]ill the proposal result in [d]eterioration of ambient (existing) air quality?" and "[w]ill the proposal result in [a] change in the natural functioning of an old growth ecosystem?" (Def.'s RJN, Ex. 13 at 2,6.)

**7.** TRPA can also find that a proposed project "could have a significant effect on the environment, but due to the listed mitigation measures which have been added to the project, could have no significant effect on the environment." (TRPA's Code § 5.2.B(2).) For simplicity, we will focus on the two other options (finding that a project either may have or could not have a significant effect on the environment) because mitigation measures are not currently at issue in this case.

"lacking substantial evidentiary support" or is "not supported by substantial evidence in light of the whole record," Compact, Art. VI(j)(5).[8]

### b) TRPA is not bound by NEPA.

As the statutory language in NEPA is very similar to Article VII of the Compact, the Committee believes that NEPA binds TRPA to provide similar environmental protection to the Basin. *Compare* 42 U.S.C. § 4332, *with* Compact, Art. VII. The Committee argues that the IEC procedure is inconsistent with the Ninth Circuit's interpretation of similarly-worded language in NEPA. *Compare* 42 U.S.C. § 4332(2)(A) (mandating in part that "all agencies of the Federal Government shall" include a detailed environmental statement with proposals for legislation and other major Federal actions "significantly affecting the quality of the human environment"), *with* Compact, Art. VII(a)(2) (stating in part that TRPA shall prepare a detailed EIS "when acting upon matters that have a significant effect on the environment"). The thrust of the Committee's position is that NEPA does not provide for the less demanding IEC procedure to determine whether a project has a "significant effect on the environment;" therefore, the Committee argues that TRPA's interpretation of the Compact provides less environmental protection to the Basin than Congress intended when it approved the amended Compact, which was modeled in part on NEPA.

To bolster its argument, the Committee relies on the fact that Congress enacted NEPA in 1970, ten years before the Compact was amended in 1980. Moreover, Article VII, in its entirety, was drafted and appended to the then-existing Compact. Since NEPA was enacted before Congress approved the amended Compact and contains similar language to the newly-added Article VII, the Committee argues that previous judicial and agency interpretations of NEPA are binding on TRPA. *See Yates v. United States*, 354 U.S. 298, 309, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) ("adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretation of the wording [... and] a presumption of legislative intent [...] which varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted and the presence or lack of other indicia of intention.") (citations and internal quotations omitted), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). *But see Cal. Tahoe Reg'l Planning Agency v. Sahara Tahoe Corp.*, 504 F.Supp. 753, 762–63 (D.Nev.1980) (Reed, J.) (rejecting "claim that TRPA is federal agency within the meaning of NEPA" and holding that "the better case authority holds that TRPA is not subject to NEPA").

---

8. The Compact is somewhat unclear as to the proper standard of review to apply in this instance. Although TRPA's Code of Ordinances states that an IEC shall be completed by "an applicant for a project" (TRPA's Code § 5.3.A) and a decision to approve a project is reviewed for "substantial evidence in light of the whole record[,]" Compact, Art. VI(j)(5), it also appears that the Compact sets forth a different standard to review a challenge to the enactment of an ordinance, *see* Compact, Art. VI(j)(5). In this case, the Committee also challenges enactment of the Scenic Review Ordinance and the standard for challenging ordinances is whether the act or decision was "lacking substantial evidentiary support." *See* Compact, Art. VI(j)(5). Notwithstanding the semantic difference between the two standards, we believe that these two standards are essentially identical. Under either standard, we review for whether TRPA based its decision on "substantial evidence." *See* Compact, Art. VI(b) (stating that TRPA must make written findings on the basis of "substantial evidence" before adopting ordinances); Compact, Art. VI(j)(5).

Although *Sahara Tahoe* was decided a few months before Congress approved the amended Compact, our reasoning in *Sahara Tahoe* supports the determination that TRPA is not a federal agency and it is, therefore, not directly governed by NEPA. *See Sahara Tahoe*, 504 F.Supp. at 762–763 (relying on the Supreme Court's reasoning in *Lake Country Estates, Inc. v. TRPA*, 440 U.S. 391, 399, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), for the proposition that federal involvement in TRPA is not substantial enough to make TRPA a federal agency or subject it to NEPA because the federal involvement is limited to the appointment of one nonvoting member to the governing board, Congressional approval, and some federal funding); *see also* 42 U.S.C. § 4332 (stating that NEPA applies to "all agencies of the Federal Government"). Therefore, because TRPA has substantial state involvement and limited federal oversight, TRPA is not a federal agency and is bound by Article VII and not NEPA. Thus, NEPA provides, at most, persuasive authority for the proper interpretation of Article VII of the Compact.

### c) TRPA's IEC procedure is a reasonable interpretation of the Compact.

 Because NEPA is only persuasive authority for interpreting Article VII of the Compact, our review in this case is limited to whether TRPA's construction of its Compact and its adoption of the IEC procedure is reasonable. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (stating that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an · agency"). In light of the similarity between the Compact and NEPA, we must, therefore, analyze whether TRPA's construction of its Compact is reasonable in light of NEPA.

In its opposition brief, the Committee has cited several opinions addressing NEPA's EIS procedure that were issued after the adoption of the Compact in 1980. Even if we were to accept the Committee's argument that Congress was presumed to have intended then-existing judicial interpretation of NEPA to apply to the Compact, *see Yates*, 354 U.S. at 309, 77 S.Ct. 1064, only decisions that were rendered prior to the Compact's approval in 1980 would seem to be relevant to such a determination. *See, e.g., Brosseau v. Haugen*, —— U.S. ——, —— n. 4, 125 S.Ct. 596, 600 n. 4, 160 L.Ed.2d 583 (2004) (commenting that, for purposes of determining whether a right was clearly established at the time, decisions that postdate the conduct in question could not give fair notice to officer in question and are no use in the clearly established inquiry). Decisions that postdate Congressional approval of the Compact could not be said to have given notice to Congress of the meaning that courts and/or federal agencies have ascribed to this language. *See, e.g., id.* Therefore, we believe that interpretations of NEPA that postdate Congressional approval of Article VII in 1980 are of little use in determining Congressional intent; it is not logical that Congress intended for Article VII to be interpreted in a manner that had not yet been announced at that time. For this reason, post–1980 decisions or interpretations carry little, if any, persuasive weight. With that temporal limitation in mind, we have searched the pre–1980 case law and have neither found a decision that casts serious doubt on TRPA's IEC process nor has the Committee directed the court towards such a decision.

Furthermore, as pointed out by TRPA, the IEC procedure is not necessarily inconsistent with NEPA. NEPA mandates that "[a]gency procedures ... shall include ... [s]pecific criteria for and identi-

fication of those typical classes of action: . . . [w]hich normally do not require either an environmental impact statement or an environmental assessment." 40 C.F.R. § 1507.3(b)(2)(ii) (2004). An identical regulation was in place in 1980, when Article VII of the amended Compact was approved by Congress. *See* 40 C.F.R. § 1507.3(b)(2)(ii) (1980). Therefore, it is clear that NEPA's regulations, both in 1980 and in 2002 (when the events at issue in this case occurred), contemplated situations where no EA or EIS would be necessary to determine the extent of the environmental impact. This supports the contention that TRPA's less stringent IEC procedure is not contrary to the spirit or intent of NEPA, as it was understood by Congress in 1980, because NEPA clearly contemplated situations where no EA or EIS would be required. TRPA merely adopted a different, perhaps more flexible method, for making such a determination to not prepare an EA or an EIS. In sum, our review of the regulations passed pursuant to NEPA and judicial interpretations of NEPA do not render TRPA's IEC procedure unreasonable.

Although the IEC ordinance does not seem to mesh perfectly with the contours of this case, as it is unclear whether this is a "project" or the enactment of an ordinance (*see, supra,* note 8), the use of an IEC to flag potential significant environmental impacts is not unreasonable under the facts of this case. First, TRPA is a land use planning agency with local responsibilities (such as approving permits to expand one's home) that are not typical of the larger, one-time projects that are subject to NEPA. *See, e.g., Maryland–National Capital Park & Planning Comm'n v. U.S. Postal Service,* 487 F.2d 1029, 1032 (D.C.Cir.1973) (involving the decision whether to build a post office bulk mail center on a particular site); *Ocean Advocates v. United States Army Corps of Engineers,* 402 F.3d 846, 855–56 (9th Cir.

2005) (reviewing decision to approve the building of a new platform on an existing pier). Second, the Compact sufficiently constrains TRPA's discretion because it mandates that TRPA make its findings on the basis of "substantial evidence." Compact, Art. VI(j)(5). TRPA's Code Section 5.3 reinforces this requirement by stating that TRPA shall require the preparation of an EA if the IEC does not provide sufficient information to make appropriate findings regarding the significance of the effect on the environment. The net result is that the IEC procedure is ultimately subject to judicial review if it does not provide "substantial evidence" for its conclusion, and this limits the ability of TRPA to use an IEC to short-circuit the requisite level of environmental protection.

Therefore, in this case, we find that TRPA's interpretation of its Compact— adopting an ordinance that permits it to use an IEC to determine that the Scenic Review Ordinance "could not have a significant effect on the environment"—is reasonable, and, thus, not contrary to law. We note that this finding does not authorize the use of an IEC in all cases because TRPA also must satisfy its obligations under the Compact to justify its findings on the basis of "substantial evidence." Compact, Art. VI(b); Compact, Art. VI(j)(5). We simply hold that, under the Compact and facts of this case, TRPA's construction of its Compact is reasonable; therefore, TRPA may use an IEC to make a finding of no significant effect on the environment, so long as such a decision is based on "substantial evidence."

### 2. The meaning of "substantial evidence."

Our previous written order (# 78) analyzed the meaning of "substantial evidence." For simplicity, we will only re-

peat the relevant portion of that analysis here.

The deferential "substantial evidence" standard of review is common in judicial review of agency decisions. *See Aegerter v. City of Delafield,* 174 F.3d 886, 889 (7th Cir.1999). Courts have construed substantial evidence to mean "less than a preponderance, but more than a scintilla of evidence." *Cellular Tele. Co. v. Town of Oyster Bay,* 166 F.3d 490, 494 (2d Cir. 1999). In making this determination, a court views the entire record to see if it contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See id.* (citation and internal quotations omitted); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation and internal quotations omitted) (same standard).

### 3. TRPA had "substantial evidence" to make its determination that no EIS was required.

█ TRPA prepared an IEC and determined that "[t]he proposed project could not have a significant effect on the environment and a finding of no significant effect shall be prepared." (Def.'s RJN, Ex. 13 at p. 18.) TRPA argues, therefore, that the Code and the Compact do not require it to prepare an EIS. *See* Compact, Art. VII(a)(2); (TRPA's Code § 5.6.) We previously held (# 78) that the Committee's original complaint did not allege facts that an EIS was required. Like the Committee's original complaint, most of the allegations in its amended complaint are merely conclusory allegations related to the need to prepare an EIS ("TRPA's actions will result in a direct physical change to the environment") or the requirements of an EIS if one was prepared ("TRPA failed to consider alternatives to the proposed project"). (Pl.'s Am. Compl., ¶ 38(b) & (e).) The sole new factual contention raised in the Amended Complaint is that "TRPA's scenic regulations and visual magnitude concept will result in a negative impact on the quality of architectural design at Lake Tahoe, including the promotion of designs which break up the facade of a home." (*Id.* at ¶ 38(n).) Essentially, the Committee is arguing that the Scenic Review Ordinance will have a negative impact on its members' ability to freely design structures on their properties; thus, resulting in a significant effect on their man-made environment.

However, we believe that this rationale twists the concept of "significant effect on the environment" beyond its breaking point. TRPA was created, in large part, because "[i]ncreasing urbanization [was] threatening the ecological values of the region[,]" Compact, Art. I(a)(5), and there was a need to maintain "the significant scenic, recreational, educational, scientific, natural public health values provided by the Lake Tahoe Basin[,]" Compact, Art. I(a)(6). TRPA's scenic thresholds, its Regional Plan and its Code of Ordinances focus on the impact that the man-made environment has on the scenic natural beauty of the Lake Tahoe Basin; neither the scenic thresholds nor the Compact itself are meant to protect the beauty of residential design from encroachment by the natural beauty of the Basin.

We see no indication in TRPA's Compact or its Code that "significant effect on the environment" was meant to include significant effects on the quality and design of one's home. *See, e.g., Maryland–National Capital Park,* 487 F.2d at 1038–39 (commenting that an EIS to address the aesthetic considerations of a new post office was not required under NEPA "where the claim of NEPA application is focused on alleged [a]esthetic impact and the matters at hand pertain essentially to issues of individual and potentially diverse tastes"). TRPA was created with the goal

of preserving and maintaining the natural environment from man, not the other way around. Whether or not homeowners find TRPA's Scenic Review Ordinance unwise, overbearing, costly, unnecessary, or unaesthetic, this does not mean that it will have a "significant effect on the environment" such as to require the preparation of an EIS. *See* Compact, Art. VII(a). Moreover, given that the Committee has failed to identify any "significant effect on the environment" other than a potential aesthetic impact on home design, it is unclear how an EIS would or could clarify this aesthetic issue. *See Maryland–National Capital Park*, 487 F.2d at 1039 ("Given the limited scope of judicial review of such matters [and] our inability to discern the value or contours of further investigation, we cannot forecast as at all likely the possibility that plaintiff will prevail in showing it was arbitrary or capricious, or contrary to the requirement of NEPA, to decline to write a detailed impact statement on the [a]esthetic impact of the project.").

We note that our inquiry into potential "significant effect[s] on the environment" might have been different had the Committee alleged facts or put forth cognizable theories that called into question the conclusions reached in the IEC. However, the Committee does not point out any significant effect on the environment that is cognizable under the Compact; thus, despite taking as true the facts alleged in the Committee's Amended Complaint, the judicially-noticed record establishes that TRPA's IEC procedure provided "substantial evidence" that the Scenic Review Ordinance will not have a "significant effect on the environment." The Committee's other conclusory and/or counter-intuitive statements to the contrary are not sufficient in this context to overcome TRPA's motion to dismiss. *See In re Stac Elecs.*, 89 F.3d at 1403 (commenting that "[c]onclusory allegations and unwarranted inferences" will not defeat a motion to dismiss).

In conclusion, the Committee's Amended Complaint fails to allege facts raising a substantial question of whether an EIS was required under the Compact, or that TRPA's decision to not prepare an EIS was either "lacking substantial evidentiary support" or "not supported by substantial evidence in light of the whole record." [9] *See* Compact, Art. VI(j)(5). The Committee has not alleged any facts that would call into question the conclusions reached by the IEC regarding environmental impacts; therefore, we find that the IEC provided more than a mere "scintilla of evidence" that an EIS was not required and the IEC also includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Cellular Tele.*, 166 F.3d at 494; *see also Richardson*, 402 U.S. at 401, 91 S.Ct. 1420 (citation and internal quotations omitted). Accordingly, TRPA was not required to prepare an EIS in this case and we must dismiss the Committee's first claim with prejudice.

**B. Claim Two: TRPA Effected a Taking of the Property of Committee's Members under the *Penn Central* test.**

As authorized by our order (# 78), the Committee's Amended Complaint (# 96) asserts only an as-applied takings claim under the *Penn Central* test. In its Mo-

---

**9.** We likewise find that TRPA was not required to prepare an EIS to address economic concerns. Although an EIS must address economic considerations as it relates to mitigation measures, mitigation measures are not at issue in this case. Furthermore, the issue in this case is whether TRPA was required to prepare an EIS, not what an EIS should look like if prepared, and economic considerations are not sufficient to trigger the need for an EIS under the Compact or the Code.

tion to Dismiss (# 100), TRPA argues that the Committee lacks associational standing to raise such a claim on behalf of its members. The Committee counters that it has standing to raise this claim because it seeks only equitable relief. Since the Committee previously brought a facial challenge, we have not yet addressed the associational standing issue with regards to an as-applied takings claim. To address this standing issue, we will first lay out the general law of an as-applied takings claim under the ad hoc, fact-intensive legal standard because this standard is highly relevant to the standing issue. Then, we will analyze the threshold question of whether an as-applied takings claim is susceptible to the requirements of associational standing under the facts of this case.

### 1. Takings Clause.

The Takings Clause of the Fifth Amendment to the United States Constitution provides as follows: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (internal citation, quotation marks and brackets omitted).

The Takings Clause is applicable to the States through the Fourteenth Amendment. *Dolan v. City of Tigard*, 512 U.S. 374, 383, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Although TRPA is not, technically speaking, a state or subdivision of a state, TRPA is, nonetheless, liable for violations of the Takings Clause. *Tahoe–Sierra Pres. Council v. TRPA*, 34 F.Supp.2d 1226, 1238 (D.Nev.1999) (Reed, J.), *rev'd on other grounds*, 216 F.3d 764 (9th Cir.2000), *aff'g* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

### 2. Facial v. as-applied takings.

 A facial takings challenge asserts that the mere enactment of a statute constitutes a taking, as contrasted to an as-applied challenge, "which 'involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation.'" *See Hotel & Motel Ass'n v. City of Oakland*, 344 F.3d 959, 965 (9th Cir.2003) (quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 686 (9th Cir.1993)); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494–95, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (distinguishing facial takings claims from as applied takings claims). As discussed previously, the Committee brings its amended takings claim solely on an as-applied basis.

### 3. Regulatory takings.

The government can violate the Takings Clause either by direct government appropriation of property without just compensation as explicitly enumerated in the text of the Fifth Amendment; or the government can effect a taking by government regulation, which is known as a regulatory taking and is not specifically referenced in the text of the Fifth Amendment. *See Tahoe–Sierra Pres. Council*, 535 U.S. at 321–22, 122 S.Ct. 1465. The Ninth Circuit recently reiterated that "[a] regulatory taking occurs when the value or usefulness of private property is diminished by a regulatory action that does not involve a physical occupation of the property." *Hotel & Motel Ass'n*, 344 F.3d at 965 (quoting *Levald*, 998 F.2d at 684) (internal quotations omitted). The test for a regulatory taking revolves around the concept that while property may be regulated to a certain extent, "if regulation goes too far it will be recognized as a taking." *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (Holmes,

J.) (giving birth to the concept of regulatory takings). In this case, the Committee brings a regulatory taking claim because it asserts that TRPA's regulatory actions have caused its members' property values to substantially decrease. (*See* Pl.'s Am. Compl., ¶¶ 40–41.)

### 4. As-applied *Penn Central* analysis of regulatory takings.

Regulatory takings, such as the claims raised by the Committee, are analyzed under the standard laid out in *Penn Central Transportation v. City of New York*, 438 U.S. 104, 123–125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which is known as the *Penn Central* test. *See Tahoe–Sierra Pres. Council*, 535 U.S. at 330, 122 S.Ct. 1465 (stating that *Penn Central* test provides the proper analytical framework for a takings claim when a land use regulation does not result in a "complete elimination of value" or a "total loss" of the parcel).

■ The Supreme Court's ad hoc, fact-based *Penn Central* inquiry is "designed to allow careful examination and weighing of all the relevant circumstances." *See Tahoe–Sierra Pres. Council*, 535 U.S. at 322, 122 S.Ct. 1465 (citations and internal quotations omitted). The *Penn Central* test identifies three factors of particular significance: (1) the economic impact of the regulation on the property owner, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the government invasion. *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646.

■ Under the *Penn Central* test, a property owner is not entitled to the most beneficial use of the property. *See Penn Central*, 438 U.S. at 125, 98 S.Ct. 2646; *see also William C. Haas & Co. v. City & County of San Francisco*, 605 F.2d 1117, 1120–21 (9th Cir.1979) (holding that the economic impact—a decrease in affected property's value from $2 million to $100,-000—standing alone is not sufficient to state a taking). The *Penn Central* test also requires an analysis of the reasonableness of a landowner's investment-backed expectations. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 633, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J., concurring) ("[T]he regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations."). In other words, the landowner's investment-backed expectations must be reasonable. *See id.*

### 5. Associational standing to raise as-applied takings claim under *Penn Central*.

In analyzing the associational standing issue, we will first lay out the prerequisites for associational standing. Then, we will detail the reasons that the Committee's as applied takings claim fails to meet said requirements because of the nature of the ad hoc, fact-specific *Penn Central* test.

#### a) Associational standing.

■ One element of the case and controversy requirement under Article III of the Constitution is that the plaintiff, including an association, must have standing to raise each claim. An organization may sue on behalf of its members in a representational capacity if the following tests are met: "its members would otherwise have standing to sue on their own right; the interests it seeks to protect are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir.2003) (applying the same elements for associational standing).

■ In order to assess associational standing, we must also look to whether the

individual members of the association have standing. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. To allege standing under Article III, an individual plaintiff must meet three elements: (1) a concrete and particularized "injury in fact" that is actual or imminent; (2) a causal connection between the injury and the challenged conduct such that the injury is "fairly traceable" to defendant's conduct; and (3) a likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and brackets omitted). The plaintiff "has the burden of alleging facts sufficient to satisfy these three elements." *See Schmier v. U.S. Court of Appeals for Ninth Cir.,* 279 F.3d 817, 821 (9th Cir. 2002).

#### b) The Committee lacks associational standing.

Under the facts alleged in the Committee's Amended Complaint (# 96), the first two elements of associational standing are met. As to the first requirement of associational standing, the Committee's members would have standing to sue individually. The Amended Complaint alleges that the Committee's members "are being denied permit applications" (Pl.'s Am. Compl., ¶ 2) and that this "represents a confiscation by TRPA of over $100 million" (Pl.'s Am. Compl., ¶ 41). This is sufficient to allege injury in fact and a causal connection.[10] Furthermore,

the final element of individual standing (redressability) is met because a ruling in the Committee's favor on the takings issue would entitle its members to either just compensation or an injunction.

As to the second element of associational standing (suit is germane to the Committee's purpose), this test is also met because the Amended Complaint makes it clear that the Committee was formed "to promote and support the protection of Lake Tahoe through effective, fair, and reasonable regulation of building development and use within the Lake Tahoe basin." (Pl.'s Am. Compl., ¶ 2.) Thus, the Committee's challenge to the Scenic Review Ordinance, which is an ordinance that allegedly seeks to overly regulate and restrict housing design, is germane to the group's purpose of promoting "effective, fair, and reasonable regulation of building development and use" in the Basin.

Therefore, the dispositive consideration turns on the third prong of associational standing: whether the as-applied takings claim or the relief requested will require the participation of the Committee's members. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. While the other components of the standing inquiry are Constitutional, this third part represents prudential concerns. *Oregon Advocacy Ctr.,* 322 F.3d at 1109. As the Supreme Court has stated, "the third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or

---

10. Although TRPA asserts that the Committee's allegation that its members have been denied permits is false, we are bound to take this allegation as true and construe it in the light most favorable to the Committee in determining the issue of standing. *See Warth v. Seldin,* 422 U.S. 490, 500 n. 12, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). We note that attorneys face consequences for submitting a complaint with factual allegations that, after a reasonable inquiry, do not have evidentiary support and are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. *See* Fed. R.Civ.P. 11(b)(3). This should properly deter an attorney from filing a complaint with a false factual allegation or from defending such a false allegation in an opposition brief. *See* Fed.R.Civ.P. 11(a). Since Fed.R.Civ.P. 11 serves as a sufficient deterrent to falsifying allegations in a complaint, we must take the Committee's allegations as true.

controversy within the meaning of the Constitution." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 557, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Because this prong of the associational standing test is not Constitutional, but is prudential and is based on concerns for convenience and efficiency, Congress can abrogate this standing requirement in certain circumstances. *See, e.g., United Food,* 517 U.S. at 558, 116 S.Ct. 1529 (holding that Congress could authorize union to sue on behalf of its members because Congress could remove prudential rules of "judicial self-governance"); *Oregon Advocacy Ctr.,* 322 F.3d at 1113 (holding that Congress abrogated the prudential requirement by authorizing advocacy groups to sue on behalf of mentally ill criminal defendants).

However, in this case, there is no indication that Congress has abrogated this prudential requirement so that a group representing homeowners may make an as-applied takings claim on the homeowners' behalf. As discussed extensively in our written order (# 78), the Scenic Review Ordinance (the "SRO") will affect homeowners in distinctly different ways depending on the type of project they seek a permit for (exempt in-kind replacements or major remodels) and the specifics of their homes (e.g., the color of the house, the visible square footage, the number of windows, etc.). The application of the multi-faceted SRO to the fact-specific situation presented by each different parcel of land, the type of permit sought by the homeowner, and the varied options for compliance presented by the SRO mitigates against finding that the prudential component of associational standing is met

in this instance. Furthermore, the investment-backed expectations and the economic impact will differ from homeowner to homeowner.

The Committee tries to overcome this prudential hurdle by seeking solely equitable (declaratory and injunctive) relief. *See, e.g., Hunt,* 432 U.S. at 339, 345, 97 S.Ct. 2434 (finding associational standing to exist in case where group brought action for declaratory relief and an injunction on behalf of its members); *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (noting that cases recognizing associational standing have involved claims for equitable relief); *Pennell v. City of San Jose,* 485 U.S. 1, 6 n. 3, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (stating that an association composed of homeowners and lessors had associational standing to challenge constitutionality of ordinance that had the potential to limit a lessor's ability to increase rent). However, despite the Committee's argument to the contrary, seeking equitable relief does not *per se* overcome the prudential prong of associational standing. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434 (stating that associational standing is only proper "if neither *the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit") (emphasis added).

While the Committee might be correct that the equitable *relief* that it requested does not require the participation of its members, it must also demonstrate that the *claim* itself does not require the participation of its members. However, under the fact-specific legal test applied in this instance, it is clear that the claim itself will require the participation of the Committee's members.[11] Thus, we find that the

11. A useful comparison could be made between the two types of claims raised by the Committee in its Amended Complaint. In contrast to the Committee's as-applied takings

claim, the Committee's EIS claim does not involve the participation of the Committee's members because it involves a challenge to the environmental processes followed by

prudential concerns presented by the Committee's takings claim are real and substantial, and they advise against finding associational standing in this instance.

Moreover, the cases relied on by the Committee are distinguishable. First, unlike *Pennell*, *Hunt*, and *Warth*, the Committee's takings claim involves analysis under the ad hoc, fact-specific *Penn Central* test; such an analysis is not conducive to generalizations, but must focus on the specifics of each parcel of land. *See Tahoe-Sierra Pres. Council*, 535 U.S. at 322, 122 S.Ct. 1465. In this case, the prudential focus on administrative efficiency is further highlighted because the takings analysis will depend on the facts of each individual parcel of land, including the length of time that the homeowner has owned the land, the investment-backed expectations of the homeowner, and the use that the homeowner desires for her property. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. Factors such as the extent of the taking and the reasonable expectations of each homeowner will differ from parcel to parcel, and raising such claims in a group fashion will be both inefficient and burdensome on the court; and, in all likelihood, this type of claim will eventually require the participation of individual property owners. This is especially true if TRPA elects to pay just compensation rather than rescind or withdraw the Scenic Review Ordinance.

Second, *Warth* is also distinguishable; both because it did not involve a takings analysis under *Penn Central*, and because the *Warth* Court found that associational standing did not exist under the facts alleged in the complaint. 422 U.S. at 514–

18, 95 S.Ct. 2197 (finding that several different groups did not have associational standing to pursue claims on behalf of their members). *Pennell* and *Hunt* are likewise distinguishable because they both involved facial challenges and not as-applied claims. *See Pennell*, 485 U.S. at 7 n. 3, 108 S.Ct. 849 (facial takings challenge); *Hunt*, 432 U.S. at 339, 97 S.Ct. 2434 (facial challenge under commerce clause). Facial challenges by their very nature focus on the mere enactment of the statute or ordinance. This is distinct from an as applied challenge that will differ in application and analysis depending on the specifics of the person challenging the government action. (*See, supra*, note 11.) By challenging the Scenic Review Ordinance through its separate and disparate effects on each of its different members, the Committee is necessarily involving those members in this dispute.

Third, and finally, as pointed out by TRPA, most of the other courts to address this issue have come to the conclusion that an association lacks standing to assert an as applied takings claim under *Penn Central*. *See Ga. Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322–23 (11th Cir.2003) (per curiam) (holding that plaintiff lacked associational standing to assert an as-applied takings claim because such a claim "will vary depending upon the economic circumstances of each of its members" and, thus, required the participation of those members); *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 597 (2d Cir. 1993) (reasoning that an association lacked standing to bring an as-applied takings claim because (1) "it is impossible to dis-

---

TRPA. This claim revolves around TRPA's alleged unlawful interpretation of the Compact and its alleged failure to base its decision on substantial evidence; thus, unlike the *Penn Central* takings claim, the EIS claim does not depend on the facts and circumstances of the person challenging the action. Therefore, the Committee had associational standing to raise the EIS claim, but lacks associational standing to raise a claim, such as an as-applied *Penn Central* takings claim, where the analysis of the claim differs depending on the person or entity bringing said claim.

cern the identity of the aggrieved parties without delving into individual circumstances[,]" and (2) the takings determination will depend on "a variety of financial and other information unique to each landlord"); *see also Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 849–50 (9th Cir.2001) (en banc) (recognizing that associational standing may be proper in certain circumstances for a claim of equitable relief, but finding that it did not exist in this case because the relief sought required the participation of individual members); *Cf. Pharma. Care Mgmt. Ass'n v. Rowe*, 307 F.Supp.2d 164, 172–174 (D.Me.2004) (distinguishing *Rent Stabilization* and finding associational standing proper in case where trade association brought facial takings challenge seeking equitable relief).

Therefore, we hold that the Committee does not have associational standing to bring an as-applied takings challenge because of the ad hoc, fact-specific legal test to be applied and the different options for review allowed by the Scenic Review Ordinance. The prudential component of associational standing bars this action because the Committee's claims are derivative of its members' claims and our analysis of these claims will necessarily require the participation of individual homeowners in this lawsuit.[12] We think the better and wiser course is to leave it to the individual homeowners to decide when, and if, to raise an as-applied takings claim in their individual capacities when such claims are ripe for review.

# V. CONCLUSION

The Committee has failed to state a claim for which relief can be granted. First, TRPA's construction of the Compact is not "contrary to law" because the IEC procedure is a reasonable interpretation of the Compact. Second, TRPA did not violate the Compact in this case because the IEC procedure provided "substantial evidence," more than a mere scintilla of evidence, that the Scenic Review Ordinance could not have a "significant effect on the environment" because the Committee failed to identify any environmental effect that is cognizable or requires the preparation of an EIS under the Compact. Finally, the Committee does not have associational standing to assert an as-applied takings claim on behalf of its members under the ad hoc, fact-based *Penn Central* test. For prudential reasons, this type of taking claim must be raised by an individual homeowner under the facts of this case.[13]

**THEREFORE, IT IS HEREBY ORDERED THAT,** as addressed above, TRPA's motion to dismiss (# 96) is **GRANTED.** Both of the Committee's claims are **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED THAT** this disposes of the remaining claims in this case and the claims in this case have been resolved in favor of Defendant TRPA and against Plaintiff the Committee. The Clerk shall enter judgment accordingly.

**12.** Since we resolve this case on the basis of standing, we need not reach TRPA's assertion that the Committee's claim is not ripe for review. We note that the Committee's claims appear to be ripe because the Committee alleged its members have been denied permits. (Pl.'s Am. Compl., ¶ 2.) We must accept this allegation as true for the reasons set forth in note 10.

**13.** We note that this order should not be construed as barring an individual homeowner from raising such a taking claim if she so chooses.